## A07A0335. MEWBORN v. THE STATE.
### (645 SE2d 669)

RUFFIN, Judge.

After he was found guilty of one count of child molestation and two counts of aggravated child molestation, Richard Mewborn moved for a new trial on the basis of ineffective assistance of counsel. The trial court denied his motion, and Mewborn appeals. Because Mewborn is unable to establish that his counsel's performance was deficient, we affirm.

Viewed in a light favorable to the verdict,[1] the evidence shows that Mewborn's two young children were placed in foster care after police were called to an incident at Mewborn's apartment. While in foster care, Mewborn's three-year-old son, T. M., was found performing oral sex on another young boy. On November 6, 2000, a police detective conducted a 13-minute forensic interview with T. M., which was videotaped. During this interview, T. M. denied sexual contact with anyone.

T. M. was subsequently referred to Safe Path Children's Advocacy Center, where Denise Houston conducted a forensic evaluation of T. M. The forensic evaluation process generally involves five interview sessions with a child. Among other things, the evaluator assesses the child's ability to distinguish "real and pretend" and to describe events accurately. Houston testified that T. M. was consistently able to distinguish between real and pretend.

In the third session, Houston learned that T. M. referred to his genitals as his "winky" or "pee pee." In the fourth session, in response to Houston asking "if anybody had touched him on his winky," T. M. disclosed that he and another boy in his foster home had touched and sucked each other's winkys. Houston asked T. M. if anyone else touched him. Houston testified that T. M. said "daddy does like this and [T. M.] shook his hand near his penis." When asked if it happened once or more than once, T. M. replied, "lots of times." In the fifth

---

[1] See *Redman v. State*, 281 Ga. App. 605 (1) (636 SE2d 680) (2006).

session, T. M. stated that "daddy sucked my winky." He identified his father as Richard. When asked where this took place, T. M. stated that it occurred "at the apartment," and that his mother was at the apartment but fixing breakfast. He then volunteered that he "sucked daddy's winky" and that this occurred more than once.

Similar transaction evidence was also introduced. Mewborn's former brother-in-law testified that when he was six years old, Mewborn made him perform oral sex on more than one occasion while he was at Mewborn's home. Mewborn stipulated that he entered an *Alford* plea to child molestation as a result of this allegation and received a five-year probated sentence.

Mewborn was tried and found guilty. Afterward, the trial court granted Mewborn's motion for a new trial, finding that trial counsel was ineffective because he failed to subpoena the original notes and records Houston made during her forensic evaluation of T. M. The trial court concluded that "[t]here is a reasonable probability that the jury would have reached a different verdict if Denise Houston's original notes and records had been admitted into evidence," citing both the defense expert's desire to review Houston's contemporaneous notes and compare them with later typewritten reports for inconsistencies and the jury's request for the notes during its deliberations.

Mewborn was again found guilty at the second trial. During the second trial, Houston's notes were admitted into evidence by the defense, and Mewborn's expert, Amy Morton, testified about concerns she had with Houston's interview techniques. Morton stated that Houston's notes were not "adequate or extensive enough to document what occurred in those five or six sessions" and that ideally the sessions should have been recorded. Morton objected to Houston repeatedly asking T. M. questions about abuse, as "the child eventually gets the idea . . . that his first answers were wrong and that something else must [have] happened." Morton pointed out that Houston's notes evaluating T. M. contained question marks next to both "[p]erspective taking (ability to abstract ideas and concepts)" and "[e]xhibits understanding of truth vs. lie," and the notes do not reflect that Houston ever resolved her questions about these issues. Morton testified that, according to Houston's notes, T. M. referred several times to things that happened to "Timmy," yet it was never determined whether "Timmy" exists or not.

Houston's notes also contained the notations "daddy got mad [at] mommy, then the house caught fire" and "[T. M.] talks about daddy being mean and slapping mommy in the face." On rebuttal, the State recalled Houston to the stand and asked her about these statements; she explained that a Department of Family and Children Services worker later "confirmed that those statements were true."

Mewborn now argues that trial counsel was ineffective because he admitted Houston's notes, "open[ing] the door to testimony that [Mewborn] was mean and slapped [T. M.]'s mother, and providing the State with an opportunity to corroborate the victim's story." At the hearing on the motion for new trial, trial counsel testified that he introduced selected notes of Houston's that were helpful to Mewborn, such as those indicating that T. M. might not know the difference between reality and fantasy. Before introducing the notes, he discussed potential problems with this strategy with two experienced attorneys in his law firm. He believed he could ask Morton about the notes without having Houston's comments in those same documents that were harmful to Mewborn come in. He stated that "if I had thought that [questioning Morton about the notes] was going to open the door [to rebuttal testimony that T. M. accurately reported Mewborn's slapping his wife], I would never have done it."[2] However, trial counsel conceded that, in order for Morton to explain the problems she saw in Houston's notes, those notes had to be admitted into evidence and shown to the jury.

In order to demonstrate that trial counsel was ineffective, Mewborn must show both that counsel's performance was deficient and that the outcome of the trial would have been different if not for counsel's deficient performance.[3] We will affirm the trial court's findings on a claim of ineffective assistance unless they are clearly erroneous.[4] We evaluate the reasonableness of trial counsel's tactical decisions based on the circumstances at the time the decision was made, and "effectiveness is not judged by hindsight or result."[5]

Here, Houston was the chief prosecution witness.[6] Trial counsel's strategy was to attack Houston's interview techniques and conclusions about T. M.'s ability to distinguish reality from fantasy. After consulting with other experienced criminal attorneys, he decided to do so through the testimony of his own expert about issues raised in Houston's contemporaneous notes. Mewborn admits that these notes contained "some very important positive notations, and some extremely negative notations."[7] While trial counsel now believes that

---

[2] We note that trial counsel admitted at the hearing: "I am a fan of Richard Mewborn. I still send him money. . . . I do like the man. I do believe in him. So if [you are] telling me I am up here lying, committing perjury, no, I am telling you what I honestly think; but I certainly have luggage [sic]."

[3] See *Maddox v. State*, 272 Ga. App. 440, 442 (1) (612 SE2d 484) (2005).

[4] See id.

[5] (Punctuation omitted.) *Slade v. State*, 270 Ga. 305, 307 (2) (509 SE2d 618) (1998).

[6] T. M., who was six at the time of the second trial, did not testify as to any substantive matters.

[7] Mewborn has not argued that trial counsel should have sought to introduce redacted versions of Houston's notes.

his decision to introduce the notes was wrong, under the circumstances we cannot say that his decision was incorrect when he made it.[8] This is especially so in light of the fact that Mewborn had previously been found guilty in a trial in which the notes were not introduced. Thus, we affirm the trial court's denial of Mewborn's motion for a new trial.[9]

*Judgment affirmed. Blackburn, P. J., and Bernes, J., concur.*

DECIDED APRIL 27, 2007.

*Lawrence W. Daniel*, for appellant.
*Patrick H. Head, District Attorney, Amy H. McChesney, Assistant District Attorney*, for appellee.

[8] See *Harris v. State*, 280 Ga. 372, 375 (3) (627 SE2d 562) (2006); *Slade*, supra; *Weeks v. State*, 270 Ga. App. 889, 895 (3) (c) (608 SE2d 259) (2004).

[9] See *Redman*, supra at 606-607 (3).